Ms. Peterson, I'm glad you're ready to go. We'll hear from you whenever you want to start. Thank you. May it please the Court, my name is Pam Peterson and I represent Taser International. Now, without waiving the other arguments that we've briefed, I'd like to focus today on the District Court's improper pretrial preclusion of Taser's contributory negligence affirmative defense. Despite 125 years of North Carolina contributory negligence history, barring the claims of people who failed to act reasonably for their own safety, plaintiff contends here that nothing Turner did mattered. It didn't matter that he ignored the officer's commands, it didn't matter that he advanced on a uniformed officer who had a weapon trained on his chest, and it didn't matter that he refused to submit and indeed continued his aggressive action even after he was hit with the taser darts, which according to the officer and which was undisputed in the trial court record was the reason why the officer extended the ECD cycle for a continuous 37 seconds. Ms. Peterson, in order to get the proper conceptual framework, don't we have to look at the statute that talks about contributory negligence in the context of a product liability action? I don't believe so, Your Honor. Why not? Because that does talk about whether a seller or a manufacturer, in this case Taser, could be held liable in any product liability action and we do have a failure to warn cause of action here. Where the claimant failed to exercise reasonable care under the circumstances in the use of the product and such failure was approximate cause of the occurrence that caused the injury. Why don't you have to address your argument in the context of that statutory provision? I believe we have, Your Honor, and I think that this court... Oh, I thought you said you didn't have to. I'm sorry, I misunderstood you. I thought you said that too. No. Our position is that the statute should be interpreted to include both product and non-product users based on its plain language and its legislative history, but that should this court determine that the statute not apply, the general common law in North Carolina applies in any event to bar the claim here based on Turner's contributory negligence. There really are four key North Carolina Supreme Court cases that I think are important to walk through sort of in chronological order as to how we get to this result. The first is the Clark decision, 1965, which states the universal common law rule that every person having the capacity to exercise ordinary care for his own safety against injury is required by law to do so. Every person. So that includes at the common law, product users and non-users. Then you have the Supreme Court's decision in Smith, which was a 1980 decision but was based on a claim that was pre-statute and really sets forth sort of the best indication of what the common law, as it existed in North Carolina at the time the Products Liability Act was enacted. And what it says is, in a product liability action founded on negligence, there is no doubt that plaintiff's contributory negligence will bar his recovery to the same extent as any other negligence case. Oh, sure. And that's like the case where the, I don't know which one it is by name, but where the person, the employee was contributory negligent in using the machine that was doing the weaving. Correct. So that's a classic example. But if the person didn't use the product, how is that analytical framework that you're advancing applicable? If we disagree with you that the person was using the product, and how do you then apply these cases conceptually to your theory of defense? Well, first of all, when you look at the statutory language itself, and it is quoted with the emphasis that I would like to discuss at pages 20 to 21 of our opening brief, it talks about no manufacturer shall be held liable in any product liability action. You would be reading the word any right out of the statute if it didn't apply to non-product users. The claimant here... No, because after the any, it says if. And then it tells you if. Right, and if... And I assume you're going with the third clause, the claimant fails to exercise reasonable care under the circumstances in the use of the product. Correct. So it has to be in the use of the product. Well, first of all, it says the claimant here, and I think there's a couple important distinctions. So the legislature knew when to distinguish the user versus the claimant, and you have three subdivisions of Section 99. Maybe the legislature just didn't want to use use twice in the same sentence, or maybe it wanted to be gender neutral and talk about the claimant instead of he or she. In the first two provisions, the legislature used the word the user. In the contributory negligence section of this, it instead used the claimant. That's right. But it goes on to say the claimant failed to exercise reasonable care under the circumstances in the use of the product. Right. So if it had said the user, it would have used user twice within, I don't know, 12 words of each other and might not have wanted to do that. Well, it's in the use of the product, not in his use of the product or his or her use of the product. And the reason why they didn't do that is because they wanted to be gender neutral. Well, Judge, I respectfully disagree and would refer you to the legislative addendum to our brief at page 26, which is the red line markup of the amendment legislation in 1995. And when you look at that, in subsection 2, which is sort of the assumption of the risk provision, it talks about a person who voluntarily exposed him or herself to the danger. That was language that was added as part of that amendment. Let's go to the theory, and I may be cutting you off a little unfairly and I apologize for that, but tell me if you could, in the process of making the rest of your case, why you're not really asking for a judicial grant of immunity from liability any time a person fails to submit to the police. I mean, to me, that's what your case boils down to.  Based on old concepts, I mean, generic concepts, not old, generic concepts of contributory negligence and your interpretation of the use of the product. And, you know, this Court is very reluctant, very reluctant, I would think, to confer immunity in a situation like this unless, I mean, if the law demands it, I guess you'd have to do it. But I don't understand what about the law demands it other than the fact that you're saying the use of the product means. Yeah, so that was certainly the district court's concern and hang-up was that the application of contributory negligence under these circumstances would virtually immunize TASER. That, however, is a policy, not a statutory construction. If it's a grant of judicial immunity, it's a little more than policy. If the Court is saying TASER can never be sued in any case when a defendant fails to submit, that's a little bit more than policy, isn't it? Well, I think it's, first of all, I think as a factual matter it's incorrect that it would be a grant of immunity. There are common law exceptions, for example, for gross negligence and willful and wanton conduct. Okay, for ordinary negligence. Let's talk about ordinary negligence. This would be a grant of immunity, wouldn't it? No, Your Honor, it wouldn't. Why not? Well, because, for example, the Clark case says that every person having the capacity to exercise ordinary care for his own safety against injury is required by law to do so. So you have to have somebody who has the capacity to exercise ordinary care. For everybody who is not a mentally deficient person under the law. Well, there are all kinds of incidences that police regularly encounter in the field by age, mental illness, physical or medical disability. The person is not going to have the capacity. You'd be immunized then in the case of any able-bodied adult with full cognitive capacity from ordinary negligence. You would be immunized, would you not? If they did not exercise the care of a reasonably prudent person. If they didn't submit when the taser was pointed at them, you would be immunized, wouldn't you? That would be. An adult with full cognitive capacity. I don't think that it is, to view it as immunity, it's viewing it as the application of the contributory negligence standard. When could anybody ever recover under any circumstances if they failed to submit under your theory of defense? If they didn't have capacity or if the application of the product was an approximate cause of their injury. And you go through the regular. But if they're suing you because the application of the product was the approximate cause of the injury, then automatically you would be immunized for their failure to submit. There can be multiple proximate causes. And as long as Mr. Turner's conduct was one of the proximate causes of his own injury under clearly established law in North Carolina, his claim is barred. To view it this way, Judge, we've got North Carolina is a state that's one of the most conservative in the country in terms of the application of contributory negligence. It applies to all negligent claims. And I think the statute reflects that it's very conservative. The state, quite properly, has the right to make the policy decision that it's going to protect these manufacturers. We want businesses. We want to protect businesses. We're a business-friendly state. So we're not going to let any manufacturer become liable unless one of these three limited circumstances apply. So I think the statute does reflect a policy choice to limit the instances in which a manufacturer can be held liable. Judge, I would refer you specifically to the North Carolina Supreme Court's decision in Champs, which is a 1991 decision, so it's after the enactment of the statute. And it is a case that specifically says that the statute merely codifies the common law doctrine of contributory negligence as it applies in product liability actions. This court recognized that in the Jones decision as well. But the Champs... Do you have common law actions like this that you can point to? Yes. The Hinton, the Braswell, the Benton... They're not products liability cases. None of them. Right, but they... And at products liability at common law in the Clark and in the Smith decisions, those are product liability cases, it says that the contributory negligence applies to the same extent in a product liability case as in any other case. There are not any different standards. You're a user of the product. A user of the product. Well, just because there isn't a case that specifically... You're the one that's relying on the common law. You've been chased off the statute, so you say, you look at the common law and then you say, well, just because there's not a common law case doesn't mean that's not the common law. But we generally ascertain what the common law is from the common law case. So going back to Champs, though, the key language in Champs, which I think is essential here, it says, in addition to codifying the general doctrine of contributory negligence, Section 99B4 sets out or explains more specialized fact patterns which would amount to contributory negligence in a products liability action. So those three prongs of that statute, in addition to codifying the general doctrine of contributory negligence. So that's not an all-inclusive list. And then you've got the general statute in North Carolina, Savings Clause, Section 4.1. It's saving. If you had a North Carolina case that said in a products liability case you have contributory negligence even if the user was not the plaintiff, then, you know, God bless you, is what I'd say. But you don't. Clark says every person having the capacity to exercise ordinary security for his own safety, every person, that's a product user, it's a non-product user. You know the common law. I mean, obviously, you've read your brief. I mean, you know how to do a common law analysis. And a common law analysis arises from the facts of a case. I mean, legal principles can't be airlifted. And the Champs case involved an entirely different situation. I mean, this was a cleaning product delivered to a grocery store and the employee's handling of the product. So aren't you asking us just to airlift your magic words and say they apply? No, Your Honor, not at all. And if you look at the North Carolina Supreme Court decision in Nicholson, and this, I think, is crucial, in that in that case, it specifically holds... And that's a product liability case? It is a product liability case. And, in fact, it's the case that basically adopted this court's decision in Jones, which says that you can't look at the isolated phrase in the use of the product. You have to look at the entire context of the statute and focus on under the circumstances in the use of the product. The worker didn't have his gloves on. Isn't that correct? He had the gloves on. He didn't have the hard hat on. I'm sorry, he didn't have the hard... Okay. Right. So the worker was not... I mean, how are you saying this supports your position? Well, in that case, the North Carolina Supreme Court said that the statute does not limit the defense to the plaintiff's misuse of the product. I think that's essential. It's the misuse that's the operative thing there. That's right. Well, but then it goes on to say that when you look at the phrase under the circumstances... What page are you talking about? Well, I'm talking about in the Nicholson case. Right. And what page are you reading from so I can follow you? Okay. Judge, I'm not putting my finger on it at this very moment. Okay, go ahead. I'll look while you... Yeah, but the quote is, all of the circumstances during the use of the product must be considered, not just the plaintiff's conduct with respect to the product itself. All of the circumstances during the use of the product. Right, right. And so, I mean, what plaintiffs would like you to hold here is that none of Mr. Turner's conduct immediately before the use of the product or during the use of the product on him matters. He was in control here. He was the one who had the obligation and the opportunity to stop and to submit and to prevent all harm that happened to him. He made the choice, and it was not a reasonable one. I mean, what reasonably prudent person advances on a uniformed police officer who has a weapon trained at his chest? I mean, to find that way would mean that North Carolina would become the only state in the country that didn't consider at all the plaintiff's conduct in this regard. I mean, even in comparative negligence jurisdictions. I'm not familiar with any case law that says in a products liability case that you could not have recovery in a situation like this. I had thought that you always, this was the general rule with products liability cases, but maybe I'm wrong. Well, in all of our cases around the country, Judge, where there is a comparative negligence standard that is applied, the negligence of the... Comparative negligence. Maryland has contributory negligence only, too. So I'm well familiar. I don't even think it's odd. No, but I think, but the point I'm trying to make is that in those cases, the non-user's conduct is considered in terms of the distribution of fault between the parties. So by saying here that the statute somehow restricts that so that you don't consider at all the person's own conduct, then you are making basically North Carolina to be a state where it has the most lenient, as opposed to the most stringent, contributory negligence type situation to say it doesn't apply at all, when it clearly applies in comparative negligence jurisdictions around the country. In another case that we've had with Mr. Burton, in fact, the Heston case out of California, the jury determined that the taser was only 15% responsible and the non-product user suspect in that case was 85% responsible for his own actions. You turn and flip that here, and now all of a sudden you've got in a jurisdiction like North Carolina a situation where the person isn't... It's not a police shooting case. It's not a products liability case. I'm sorry? Hinton, didn't you just say Hinton? No, Heston in California, the case I was talking about was a comparative negligence. But yes, in Hinton, that is exactly the scenario that is applicable here. You have somebody who is in a robbery situation. It was a 1983 case. It wasn't a products liability case. I understand that, but what it does, it applies the general common law rule that every person has the obligation to act in a reasonably prudent way for their own safety. And in that police scenario, and we would submit there's no basis for treating taser any differently than law enforcement under the common law, that you've got somebody who doesn't comply with officers' commands, crouches and points towards the officer in an aggressive manner, and is shot and killed, and his negligence bars his claim as a matter of law and summary judgment in that case. Okay, thank you. You've got some time remaining. Let's hear from Mr. Burton. Thank you. Good afternoon, Your Honors. Thank you very much for having me. With me at council table is Charles Everidge, who tried the case with me. In North Carolina, obviously, we believe that the jury and Judge Conrad got it right, that the judgment should be affirmed in this case, which is now over five years since the incident. Maybe you can address the last argument that your colleague on the other side made, which was that in every other jurisdiction, there would be liability here. Well, that's incorrect. I was the trial lawyer in the Heston case. There's nothing about the Heston case in the record here. It hasn't been cited by either party. It was a completely different... We're for a search for truth, so tell us how you would distinguish it. That was a completely different mechanism of death. In Mr. Heston's case, he was severely acidotic because he had taken a high level of methamphetamine and was acting out, and the police were called to his parents' house. The technical evidence in that case was that the repeated taser contractions caused an increased level in his blood acid, which combined with the elevated blood acid that he had because of his own voluntary consumption of methamphetamine and subsequent very active psychosis. And so we actually pitched to the jury during our closing argument that this was a combination of factors. That's completely different than this case, where Mr. Turner, Darrell, I mean, he was 17 at the time, was at work as a cashier. There was no involvement of drugs. I guess they would say he contributed to it by resisting arrest. Well, what... He was acting out like a young man might. He was in a dispute with his... manager. The police officer came. It's very clear from the video that Officer Dawson unholstered his taser as he walked in the door, and the sequence of events until Mr. Turner was shot in the chest can be mapped out, and it was only a matter of a few seconds. Well, let me put it to you this way. Suppose that he had charged the police officer. Would he then be contributorily negligent? Well... I thought the whole body of your argument was that because he wasn't a user of the product... Well, that's correct. But when you got into your case in California or wherever it was, it sounds like that analysis didn't work anymore. No, no, no, because in that case, it was a different mechanism of death. Well, I understand that. Your client there wasn't a user of the product either. No, but he contributed directly to his cardiac arrest by consuming the methamphetamine, which created the metabolic imbalance that triggered the cardiac arrest. You're saying he was a proximate cause of his death even though there were other proximate causes of death, including the application of the taser. Absolutely. Absolutely, and it's on all fours with a prior case of this circuit, interpreting Fourth Circuit law, where there was a smoker who filed a case for asbestos. I think that's another Smith case. Jones, maybe. I'm sorry? Jones, maybe. Jones. Jones Smith. Close enough. Thank you. And I would like to read the quote from Nicholson, which I don't know if it's in two places. I have it from our brief on page 33, but it seemed like a word got left out when I heard it read recently. This is on page 33 of our brief, quoting Nicholson, the Supreme Court. The North Carolina Supreme Court, shortly after the change, meaning his use of the product and the use of the product, reiterated the rule that, quote, all the circumstances during the plaintiff's use of the product must be considered, unquote. So there is no case that says that someone who is not using the product can have this defense of 99B3 for subdivision 3 used against it. And I think this really goes to what the common law of negligence is. In listening to Your Honor's discussion earlier in this argument, and also when I was preparing for today, it's been a while since we've been to law school, right? But we still remember things, and what popped into my mind was Cardozo's majority opinion from Paul's graph in that little quote. I'm sure you guys remember it. It was negligence in the air, so to speak, will not do. That negligence arises from specific relationships, and particularly the relationship to the foreseeability of the hazard. Here, Officer Dawson and Daryl Turner had no idea that they were engaging in what was a potentially lethal encounter. Let me ask you this, Mr. Burton. When I read North Carolina cases on contributory negligence, I sure get the impression that they believe it applies every time, everywhere, that negligence is the basis for the plaintiff's claim. Some of their cases seem to me, frankly, to be somewhat extreme, and I use Braswell as an example, where a student participating in a demonstration is bound to be contributory negligent in his own injury when he doesn't even know there's a security guard there with a gun, doesn't know he's about to shoot it, and doesn't even know there's been a shot fired until he's hit. So I just want you to explain to me why, if I'm right about that, and you don't have to, of course, agree with me, that the state of North Carolina wouldn't apply common-law contributory negligence in this situation. Thank you. Braswell is, I believe, 44 years old, and I would agree that it would be either an outlier or at least the outer margin. Isn't what you want to say about Braswell that Braswell's an assumption of risk case, and the Supreme Court in North Carolina conflated assumption of risk and contribution? Isn't that the answer? I would defer to Judge Keenan on that. Thank you. I mean, I think that's true, but also it's a question really of the hazard. I don't mean to interrupt, Your Honor. I am not sure we can say, well, North Carolina, you made a mistake in your theory, and so we're not going to, or that we can say there's a statute of limitations on case law for 40 years, but we're not going to pay it any attention. No, I quite agree. And I agree, too, but they did call it an assumption of risk in Braswell. And I think that the case is distinguishable, and it's just distinguishable in this sense. The risk that gave rise to the negligence, or the contributory negligence, because it's really two ways of looking at the same thing, was that these students were unruly, were breaking into a gym, were creating a violent confrontation. A gun went off, and one of them was struck. And everybody knows what the risks of security guards with guns, et cetera, and these kind of demonstrations are. People do get hurt. In this case, what's missing for the negligence analysis and what the North Carolina legislature is addressing by adding this in the use of the product language is some link between the risk, the foreseeability of danger, the hazard, the arising of the duty, and the character of the product itself. The problem with this device, and the appellant didn't brief the basis of the jury's finding of liability here, but it's very important, I think, to understand that, to understand the nature of the defense that's being raised. They had found out at least three years before this incident from scientists who they had paid and doctors to do research for them that darts, when they're near the heart, can cause this disruption of cardiac rhythm and cardiac arrest and death. They chose not to tell their users, not only Charlotte-Mecklenburg Police Department, Officer Dawson, but thousands of departments throughout the United States and, indeed, the world, about this,  and aimed at the heart. So no one had an idea that this was a hazard. The device is sold as a non-injuring, easy way to take people into custody. The officers tase each other during training with back shots. So it was completely unexpected, unforeseeable to Officer Dawson, and it was unexpected, unforeseeable to any reasonable person, any objective reasonable man or 17-year-old, in Mr. Turner's case, that what they were engaging in here had lethal overtones. So I think that the statute is drafted in a particular way to link any contributory negligence to the character of the product itself by using the in-the-use-of language and to not say what Chief Judge Traxler is suggesting as an alternative law that just sort of any negligence in the air, so to speak, will do. Are you going to address the damages award? Because that was apparently a significant focus of taser's brief. Well, yes, I'd be happy to move on to that. Thank you, Your Honor. Was there a sufficiency of the evidence with regard to proof of damages? Yes. There were two errors, I believe, that they assigned or requested. The first was a problem with the jury instruction, and the jury instruction that were given were the North Carolina form jury instructions only on those elements of wrongful death damages for which the plaintiffs had evidence in the record, and there was no objection to that. Taser proposed a special instruction saying the jury cannot award pre-death pain and suffering, lost income, and grief, and the judge said, no, that's not necessary because we're not authorizing it, no one's going to argue it, no one's going to ask for it, which is, in fact, what happened. On taser's only argument, during the trial, well, actually during closing, they did no evidence on damages during the trial. They asked no question of plaintiff's mother, plaintiff's father, or the decedent's mother and father. All four grandparents testified. The brother testified. The girlfriend testified. No questions. And the manager testified quite favorably about the decedent. During the closing, there was one paragraph about what the jury could not award. So there's no basis for thinking that the jury took into account anything. Right, but what evidence supports the amount of the award here? You have the loss of association. I'm not sure what the North Carolina term is on that. And here's a tragic situation involving a young man with a future. But how does the evidence support this level of damages? The jury awarded, actually, the top dollar that was requested by the plaintiff during closing. And a methodology was suggested. Actually, more than, because there was a remitted for that. There was a remitted, but it's not correct. If you look at the closing statement, it was $4 million to $5 million each. So if you take $5 million each, that makes $10 million. So the direct quote is $4 million to $5 million each. And the remitted took a mathematical computation based on the age of the parents, which they each had about a 40-year life expectancy. And if you multiply out $2,000 a week, you come up with $8 million. And so that's what the trial judge used as the top number that was pitched. Was the value of his services to the parents or to his companionship or both? It's a whole group of elements that are listed in the statute. And it's companionship, support, advice, help in old age, family services. I mean, this was a particularly good kid. This was a very nice family. They were very close. The grandparents and the parents, at least the mom, lived adjacent. The father was super involved in his son's life. The son had lived with his father for a year recently. The son, there were a lot of siblings or half-siblings. Daryl babysat. His room was immaculate. He did chores around the house. At 16, he got a 25-hour-a-week job at the supermarket. He had finished high school in very good stead. He was applying to colleges. The manager loved him. He had zero police history, was sort of a health nut, was very fit. Everything was that this was going to be an outstanding child and the kind of person who would support his parents and comfort his parents and be part of their lives for 40 years. And so the Seventh Amendment gave us a right to a jury trial. All the North Carolina law says, this determination of these general damages that are not capable of quantification is for the jury. The jury came back at $10 million, I think reflecting the quality of the evidence that they heard. The judge then, as he's allowed to do, he heard all of the same evidence. He said, well, I think that that was 25% too high. He cut that to $7.5 million. He then did a... It was one to 2,000 per week. Right. That's what was asked for. I thought you quoted me a different figure. And then I said, I did this, Your Honor, in the courtroom. That was a yardstick. Now, 2,000 a week projects out to about $8.3 million. But I said, or these are rough numbers, $4 or $5 million. That was actually stated. Two and four or five. Between two and four or five million. Between two and four or five million. Right. I guess. So the judge, in his considered opinion, having heard everything, and as he's allowed to do under the laws of Carolina, cut the amount to $7.5 million. He said, I think that would be a fair amount for what these two parents lost over a 40-year period. The President valued it to $6 million something, and then took the offsets of the two settlements. So now that we have the $5.5 million verdict, and then we accepted the remittitor, there's no case that anyone has cited where a court of appeal in North Carolina has further remitted damages that involve general damages. Is there any case from a court of appeals of North Carolina that has damages like this? Well, the case law in North Carolina is kind of old, and I think that the. Again, you embrace it in one way and then just claim it in another. When you're talking about sums of money, that's directly relevant. And a lot of verdicts and settlements were put into the record for the judge during the remittitor, and frankly, eight-figure verdicts for dead children are commonplace in the United States today. I wasn't really asking that. Well, North Carolina, from a statistical point of view, doesn't have an adequate sample size to make a judgment like that. Or any award that's close to that. There's just no comparable decisions. There was a decision in Florida that was, I think, about two or three weeks later that was brought to the trial court's attention that was $10 million and was affirmed by the trial court and not remitted. The cold court is the largest one in North Carolina, right? $1.5 million. And if we adjust that for current income, maybe that's $3.1 million. That's the cap that a North Carolina appellate court has approved today. Isn't that right? I don't think that's a cap by any means. I said it's a cap in that that's the highest amount that they've approved in damage. Do you have a case where they've approved a higher? No, but that case was many years ago, and things have changed. But they've changed. You said that it was only $1.5 million. If we adjust it for current value, it's about $3.1 million. I think each of these cases is unique. Every case is different. And the time and the way that things get at that time, what were basketball players getting paid or baseball players? I mean, or what were rents? Things have changed a lot. If we should conclude that the damage award is too great, what should we do? Well, first, I would urge you not to do that. I understand that. And second, I don't know that you've been given a criteria for doing that. Under North Carolina law, there's no mechanism for that. So we'd go back for a new trial? Is that what you're saying? I don't think we'd go back for a new trial on liability. That's what I'm asking you. What would we do? I don't know whether this court would be in a position to do a second remittitor. I don't have experience with a court of appeals doing a remittitor. Certainly when Judge Conrad did the remittitor,  and we had a choice between either a new trial or accepting the remittitor, and we accepted the remittitor, even though he did make a mistake in his calculation of present value, which he put all of it into the future. But the incident was, I think, at the time, four years in the past, or three years in the past. And our present value calculation using the same discount rate was, I believe, 6.7, which we pointed out to him. But I think that's all I can say. Thank you. Since we found no incidents of any court in North Carolina having done this. So if there are no questions about the approximate cause or the – I have a question. I'm sorry. I just didn't want to interrupt the discussion about the amount of the awards before you leave the podium. If contributory negligence should be applied in this situation, and I know you don't agree with that, but if it should be applied in this situation, how would you distinguish this situation from Braswell? Because Braswell, the hazard, was part of the situation of a bunch of rowdy young people breaking locks, jamming into an auditorium, creating a disturbance, and the risk was a firearm, which is known to cause severe injury. There's no evidence, though, that the claimant in Braswell, I don't believe, knew the officer had the gun and was going to fire it. But a reasonable person would have known, based on that situation, that something like gunfire could erupt. But, see, in that situation, you're saying that's an assumption that somebody might fire a gun. In our case, we have even more specificity. We have, in effect, the taser pointed right at him, and he sees it. Yes, but the taser is not known by anybody other than taser to be lethal. The hazard of electrocution from getting shot in the chest is not a hazard. It's lethal as opposed to knowing that it's going to fire a dart, darts into your body with the resulting electrical charges. And some temporary discomfort and incapacitation, not with cardiac arrest and death, that's what's not foreseeable here. Okay, I think I understand your point. Thank you. Do you have any more questions? No. Okay, thank you. Thank you very much. No argument. Ms. Peterson? Judge, jumping right to your foreseeability question there, the district court here erred in applying too specific of a foreseeability requirement to these circumstances. Under controlling North Carolina law, contributory negligence does not depend on a plaintiff's subjective appreciation of the danger. And Smith is very clear that you don't have to be aware of the actual danger, and in McNair it talks about you just have to be aware of the generally injurious nature of your conduct. It doesn't matter to you then conceptually that this was a failure to warn products liability case and that Braswell was not. It wasn't even a products liability case at all. And so that makes no difference in your analysis because your bedrock, your platform is generic contributory negligence. It doesn't matter what the original theory of recovery is. That's right. Any negligence case, including a products liability case based on negligence, I think that's exactly what the North Carolina cases say. But you would acknowledge that Braswell is not a products liability case. It's not. And you don't have a products liability case in North Carolina that adopts the theory that you said. No. This is an issue of first impression in that regard. You are relying on the common law. There is no common law to that effect. Well, it relies on the common law that every person is responsible for acting as a reasonably prudent person to protect themselves in any situation. I think Judge Traxler had it right on the point there. In North Carolina, that's what the cases say. This applies across the board in every negligence situation. This is a negligence-based statute. There is no strict liability in North Carolina. I just don't think, Your Honor, if you look at the key cases, Clark, Smith, Champs, and Nicholson, that those cases, those four key North Carolina Supreme Court cases simply cannot be reconciled with the result here. Nicholson talks about the plaintiff's use of the product, doesn't he? Doesn't that kind of complete the circle where we began this morning? It doesn't, Judge. Well, it does. I'm reading it. Nicholson was a pre-amendment case. All it's doing is quoting the language from the statute that existed at the time that talked about his use of the product, talked about the plaintiff's use of the product. And it says, page 240, thus all of the circumstances during the plaintiff's use of the product must be considered, not just the plaintiff's conduct with regard to the product itself. So it's keying it, again, to the use of the product, is it not? Judge, it's more expensive than that because it talks about the circumstances surrounding the use of the product, and the statutory language changed after Nicholson. Well, you can't take away the language of the use of the product. Well, no, and we don't ask to take it away, but it's modified by under circumstances. And what Nicholson and Jones specifically say is that it's broader than just that isolated phrase there. It has to be considered what were the circumstances surrounding this and can apply to other circumstances outside of the particular person's use of the product. I want to go back to, in the Heston case that we talked about, Judge, that 85% of fault that was attributed to a non-user, in a product liability case, to a non-user person, that's your comparative negligence situation. Mr. Burton tried to distinguish that situation by saying that in that case there was contributory negligence directly related to the cardiac arrest because of the use of methamphetamine. Well, in fact, that's exactly the situation what you have here. In the case here, it was the officer testified he held down the trigger for 37 seconds because Turner stayed on his feet and continued his aggressive action. Now, the plaintiff's own expert in this case testified that he could not say that Turner would have died with a standard five-second indication and that it was unlikely Turner was in verticular fibrillation during the first 20 seconds of the application. And so under those circumstances, the extended use of the product is an absolute one of those multiple proximate causes of his injury. And so you can't say as a matter of law he wasn't contributory negligence, contributory negligence. I want to hit just briefly on the damages issue that Your Honor's raised. There certainly is no case in North Carolina that approves wrongful death judgment of greater than 1.5. This is excessive. You're quite right that there is no North Carolina appellate case requiring a further remediatory either, is there? No, and I think you would have to remand for a new trial on damages certainly in that scenario. Do you have any North Carolina cases that you could point us to to help us review what our standard of review should be as to the sufficiency of the evidence supporting the damage award? The Ball decision is the one that we've relied on primarily. What does it say as far as the factors that the reviewing court looks at? Well, the statutory language requires that there be testimony as to what the parents reasonably expected in terms of future income or support. And what Ball says is that you have to have that testimony that's not presumed. You have to have testimony that there is some reasonable expectation as required by the statute. And here there simply was no such evidence. The parents never testified about anything about any reasonable expectations. I guess that he was young and healthy. I mean, why couldn't that be a basis for an inference, that that was a reasonable expectation? They had a very close family, geographically proximate to each other, and that he was young and healthy and loved his family. And certainly in terms of that, the way this was played at trial, Judge, and we asked for limiting instruction, was there was a lot of testimony about his potential earnings capacity. No, I agree with you on that. That's not in the case. I'm just talking about what measures we use. Well, it's not in the case. It wasn't supposed to be in the case. But they argued income in terms of him giving financial support to his parents in the future. And they argued that under a different prong of the statute. And so it was evidence that was admitted for a limited purpose. We asked for limiting instruction. The court didn't give it. And it was required under Rule 105 to be given. There's no discretion not to give it under those circumstances. And here, where you have the court finding that the award was excessive, it's not harmless. And the prejudice can't be cured by a remittitor. And so it needs to go back for a new trial on damages under those scenarios. Thank you. Thank you, Judge. All right, I'll ask.
judges: William B. Traxler, Jr., Diana Gribbon Motz, Barbara Milano Keenan